Andrea BLANCH, Plaintiff–Appellant,

v.

Jeff KOONS, the Solomon R. Guggen-heim Foundation, and Deutsche Bank AG, Defendants–Appellees.

Docket No. 05–6433–CV.

United States Court of Appeals, Second Circuit.

Argued: May 30, 2006.

Decided: Oct. 26, 2006.

As Amended Nov. 16, 2006.

Robert W. Cinque, Cinque & Cinque, P.C. (James P. Cinque, of counsel) New York, NY, for Plaintiff–Appellant.

John B. Koegel, The Koegel Group, New York, NY, for Defendant–Appellee Jeff Koons.

Lawrence B. Friedman, Cleary Gottlieb Steen & Hamilton LLP (Inna Reznik, Hoon–Jung Kim, of counsel) New York, NY, for Defendant–Appellee The Solomon R. Guggenheim Foundation.

Carol A. Witschel, White & Case LLP (Steven Betensky, Stefan M. Mentzer, of counsel), New York, NY, for Defendant–Appellee Deutsche Bank AG.

Before: SACK and KATZMANN, Circuit Judges, and MURTHA, District Judge.* Judge KATZMANN concurs in a separate opinion.

SACK, Circuit Judge.

This appeal presents the question whether an artist's appropriation of a copyrighted image in a collage painting is, under the circumstances, protected "fair use" under the copyright law. *See* 17 U.S.C. § 107.

On commission from defendants Deutsche Bank AG, a German corporation ("Deutsche Bank"), and The Solomon R. Guggenheim Foundation, a New York not-for-profit corporation ("Guggenheim"), defendant Jeff Koons created a collage painting, initially for display in Berlin, Germany, in which he copied, but altered the appearance of, part of a copyrighted photograph taken by the plaintiff Andrea Blanch. After seeing the painting on subsequent display at Guggenheim's museum in New York City, Blanch brought this action for copyright infringement. The district court (Louis L. Stanton, *Judge*) granted summary judgment to the defendants on the ground that Koons's appro-

priation of Blanch's photograph was fair use. We affirm.

## BACKGROUND

Jeff Koons is a visual artist. His work has been exhibited widely in museums and commercial galleries and has been the subject of much critical commentary. He is known for incorporating into his artwork objects and images taken from popular media and consumer advertising, a practice that has been referred to as "neo-Pop art" or (perhaps unfortunately in a legal context) "appropriation art."[1] His sculptures and paintings often contain such easily recognizable objects as toys, celebrities, and popular cartoon figures.

Koons has been the subject of several previous lawsuits for copyright infringement. In the late 1980s, he created a series of sculptures for an exhibition entitled the "Banality Show" ("Banality"). In doing so, he commissioned large three-dimensional reproductions of images taken from such sources as commercial postcards and syndicated comic strips. Although many of the source images were copyrighted, Koons did not seek permission to use them. In separate cases based on three different sculptures from "Banality," this Court and two district courts concluded that Koons's use of the copyrighted images infringed on the rights of the copyright holders and did not constitute fair use under the copyright law. *See Rogers v. Koons,* 960 F.2d 301 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Campbell v. Koons,* No. 91 Civ. 6055, 1993 WL 97381, 1993 U.S. Dist. LEXIS 3957 (S.D.N.Y. Apr.1, 1993); *United Feature Syndicate v. Koons,* 817 F.Supp. 370 (S.D.N.Y.1993).

---

* The Honorable J. Garvan Murtha of the United States District Court for the District of Vermont, sitting by designation.

1. *See* E. Kenly Ames, Note, *Beyond Rogers v. Koons: A Fair Use Standard for Appropriation,* 93 Colum. L.Rev. 1473, 1477–80 (1993).

The present action arises in connection with a later series of Koons's work entitled "Easyfun–Ethereal." It was commissioned in 2000 by Deutsche Bank in collaboration with Guggenheim.

Deutsche Bank and Guggenheim have jointly established the "Deutsche Guggenheim Berlin," an art exhibition space housed in a Deutsche Bank building in Berlin, Germany. Under their collaboration agreement, Deutsche Bank provides space, underwrites exhibition expenses, and pays for the commission of new works of art. Guggenheim curates the exhibitions and advises as to which work should be commissioned. Pursuant to a separate agreement, Deutsche Bank donates a fifty percent interest in each commissioned work to Guggenheim.

*Koons's Painting*

To create the "Easyfun–Ethereal" paintings, Koons culled images from advertisements or his own photographs, scanned them into a computer, and digitally superimposed the scanned images against backgrounds of pastoral landscapes. He then printed color images of the resulting collages for his assistants to use as templates for applying paint to billboard-sized, 10′ × 14′ canvasses. The "Easyfun–Ethereal" paintings, seven in all, were exhibited at the Deutsche Guggenheim Berlin from October 2000 to January 2001.

One of the "Easyfun–Ethereal" paintings, "Niagara," is the subject of this action. Like the other paintings in the series, "Niagara" consists of fragmentary images collaged against the backdrop of a landscape. The painting depicts four pairs of women's feet and lower legs dangling prominently over images of confections—a large chocolate fudge brownie topped with ice cream, a tray of donuts, and a tray of apple danish pastries—with a grassy field and Niagara Falls in the background. The images of the legs are placed side by side, each pair pointing vertically downward and extending from the top of the painting approximately two-thirds of the way to the bottom. Together, the four pairs of legs occupy the entire horizontal expanse of the painting. A black-and-white reproduction of "Niagara" is included in the Appendix to this opinion.

In an affidavit submitted to the district court, Koons states that he was inspired to create "Niagara" by a billboard he saw in Rome, which depicted several sets of women's lower legs. By juxtaposing women's legs against a backdrop of food and landscape, he says, he intended to "comment on the ways in which some of our most basic appetites—for food, play, and sex—are mediated by popular images." Koons Aff., dated June 10, 2005, at ¶ 10. "By recontextualizing these fragments as I do, I try to compel the viewer to break out of the conventional way of experiencing a particular appetite as mediated by mass media." *Id.*

*Blanch's Photograph*

Koons drew the images in "Niagara" from fashion magazines and advertisements. One of the pairs of legs in the painting was adapted from a photograph by the plaintiff Andrea Blanch, an accomplished professional fashion and portrait photographer. During her career of more than twenty years, Blanch has published her photographs in commercial magazines, including *Details, G.O., Vogue,* and *Allure;* in photography periodicals and collections; and in advertisements for clients selling products under such widely recognized names as Revlon, Universal Films, Johnny Walker, and Valentino. She is also the author of a book of photographs and interviews entitled *Italian Men: Love & Sex.*

The Blanch photograph used by Koons in "Niagara" appeared in the August 2000

issue of *Allure* magazine. Entitled "Silk Sandals by Gucci" ("'Silk Sandals'"), it depicts a woman's lower legs and feet, adorned with bronze nail polish and glittery Gucci sandals, resting on a man's lap in what appears to be a first-class airplane cabin. The legs and feet are shot at close range and dominate the photograph. *Allure* published "Silk Sandals" as part of a six-page feature on metallic cosmetics entitled "Gilt Trip." A black-and-white reproduction of the photograph is also in the Appendix.

Blanch photographed "Silk Sandals" at a "shoot" organized by Condé Nast Publications, *Allure*'s publisher. According to Blanch's deposition testimony, Paul Cavaco, the creative director of *Allure*, suggested the model, sandals, and nail polish to be used in the photograph. Blanch participated in their selection and retained control over the camera, the film, the lighting, and the composition of the photographs. She testified that it was her idea to use an airplane interior as a backdrop and to place the female model's feet on the male model's lap. She explained that she wanted to "show some sort of erotic sense[;] ... to get ... more of a sexuality to the photographs." Blanch Dep., March 8, 2005, at 112–13.

*Koons's Use of Blanch's Photograph*

While working on the "Easyfun–Ethereal" series, Koons saw "Silk Sandals" in *Allure*. According to Koons, "certain physical features of the legs [in the photograph] represented for me a particular type of woman frequently presented in advertising." He considered this typicality to further his purpose of commenting on the "commercial images ... in our consumer culture." Koons Aff. at ¶ 10.

Koons scanned the image of "Silk Sandals" into his computer and incorporated a version of the scanned image into "Niagara." He included in the painting only the legs and feet from the photograph, discarding the background of the airplane cabin and the man's lap on which the legs rest. Koons inverted the orientation of the legs so that they dangle vertically downward above the other elements of "Niagara" rather than slant upward at a 45–degree angle as they appear in the photograph. He added a heel to one of the feet and modified the photograph's coloring. The legs from "Silk Sandals" are second from the left among the four pairs of legs that form the focal images of "Niagara." Koons did not seek permission from Blanch or anyone else before using the image.

*The Parties' Economic Gains and Losses*

Deutsche Bank paid Koons $2 million for the seven "Easyfun–Ethereal" paintings. Koons reports that his net compensation attributable to "Niagara" was $126,877. Deutsche Bank received gross revenues of approximately $100,000 from the exhibition of the "Easyfun–Ethereal" paintings at the Deutsche Guggenheim Berlin, a total that includes admission fees and catalogue and postcard sales. The record does not reflect Deutsche Bank's expenses for that exhibition other than the commission of the paintings.

The subsequent exhibition of the paintings at the Solomon R. Guggenheim Museum in New York sustained a net loss, although when profits from catalogue and postcard sales are taken into account, Guggenheim estimates that it earned a profit of approximately $2,000 from "Niagara."[2] In 2004, the auction house Sotheby's reportedly appraised "Niagara" at $1 million.

2. Guggenheim's figures for catalogue and postcard sales include sales at the Deutsche Guggenheim Berlin. It is possible, therefore, that those sales are double-counted in Deutsche Bank's and Guggenheim's earnings calculations.

The work has not, however, been sold, nor does the record indicate that it or any other painting commissioned by Deutsche Bank has been offered for sale or been the subject of a bid.

*Allure* paid Blanch $750 for "Silk Sandals." Although Blanch retains the copyright to the photograph, she has neither published nor licensed it subsequent to its appearance in *Allure*. Indeed, Blanch does not allege that she has ever licensed any of her photographs for use in works of graphic art or other visual art. At her deposition, Blanch testified that Koons's use of the photograph did not cause any harm to her career or upset any plans she had for "Silk Sandals" or any other photograph in which she has rights. She also testified that, in her view, the market value of "Silk Sandals" did not decrease as the result of Koons's alleged infringement.

*This Lawsuit*

After the initial exhibition of the "Easy-fun–Ethereal" painting at the Deutsche Guggenheim Berlin, "Niagara" was exhibited in other museums and public galleries. Blanch did not see the painting until it was on display at the Guggenheim Museum in New York during the summer of 2002. On October 10, 2003, she filed this lawsuit asserting that Koons infringed her copyright in "Silk Sandals" in violation of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* On August 20, 2004, Blanch amended her complaint to add Deutsche Bank and Guggenheim as defendants and later served them with the amended complaint. She alleges that they "participated in, facilitated, and caused the acts of infringement by Koons" by commissioning the work despite knowing, based on Koons's history with, among other things, the "Banality" cases, that Koons was likely to infringe the copyrights of others. First Am. Compl. ¶ 15.

On November 1, 2005, the district court granted summary judgment to the defendants. The court concluded that Koons's "Niagara" did not infringe Blanch's "Silk Sandals" because its use of the image from "Silk Sandals" constituted fair use. *See Blanch v. Koons,* 396 F.Supp.2d 476 (S.D.N.Y.2005). Considering the four non-exclusive statutory factors upon which a fair-use determination is made, *see* 17 U.S.C. § 107, the court determined that: (1) the purpose and character of Koons's use was "transformative" and therefore favored by copyright law, *see Blanch,* 396 F.Supp.2d at 480–81; (2) Blanch's copyrighted work was "banal rather than creative," and therefore the nature of the copyrighted work weighed in favor of the defendants, *see id.* at 481–82; (3) although the women's legs are the "focal point of interest" in Blanch's photograph, the image is of limited originality, so the statutory factor concerning "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," was neutral between the parties, *id.* at 482 (citing 17 U.S.C. § 107(3)); and (4) Blanch's photograph could not have captured the market occupied by "Niagara," so that the final factor, the effect of the use upon the potential market for the copyrighted work, favored the defendants, *see id.* Based on its conclusion that, as a matter of law, each of the statutory factors concerning fair use either favored the defendants or was neutral between the parties, the court concluded that the defendants were entitled to summary judgment.

Blanch appeals.

**DISCUSSION**

I. Standard of Review

We review a district court's grant of summary judgment de novo. *See Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), *cert. denied,* 529 U.S. 1098, 120

S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment should be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "Although '[f]air use is a mixed question of law and fact,' this court has on a number of occasions resolved fair use determinations at the summary judgment stage where ... there are no genuine issues of material fact." *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir.1998) (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (other internal quotation marks and citation omitted)).

## II. Fair Use

■ The Supreme Court, in its landmark decision addressing the fair-use defense, *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), remarked: "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, 'To promote the Progress of Science and useful Arts.'" *Id.* at 575, 114 S.Ct. 1164 (quoting U.S. Const., Art. I, § 8, cl. 8).

As Judge Leval observed in his seminal law review article on the subject, the law of copyright "is intended to motivate the creative activity of authors and inventors by the provision of a special reward .... The monopoly created by copyright thus rewards the individual author in order to benefit the public." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L.Rev. 1105, 1108 (1990) (quoting *Harper & Row*, 471 U.S. at 545–46, 105 S.Ct. 2218) (ellipsis in original; internal quotation marks and footnote omitted). At the same time, though, "excessively broad protection would stifle, rather than advance, the

[law's] objective." *Id.* at 1109. "Monopoly protection of intellectual property that impeded referential analysis ... would strangle the creative process." *Id.* at 1108. Fair use should therefore be perceived as an "integral part of copyright, whose observance is necessary to achieve the objectives of that law." *Id.* at 1107.

Copyright law thus must address the inevitable tension between the property rights it establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them— or ourselves by reference to the works of others, which must be protected up to a point. The fair-use doctrine mediates between the two sets of interests, determining where each set of interests ceases to control.

The fair-use doctrine was first codified in the Copyright Act of 1976, which describes four non-exclusive factors that must be considered in determining fair use.

> [T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.

■ As the words of section 107 indicate, the determination of fair use is an open-ended and context-sensitive inquiry. In *Campbell*, the Supreme Court warned that the task

is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis. The text employs the terms "including" and "such as" in the preamble paragraph to indicate the illustrative and not limitative function of the examples given, which thus provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses. Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright.

*Campbell*, 510 U.S. at 577–78, 114 S.Ct. 1164 (citations and some internal quotation marks omitted). "The ultimate test of fair use ... is whether the copyright law's goal of 'promoting the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it.'" *Castle Rock Entm't*, 150 F.3d at 141 (quoting *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir.1992) (alteration incorporated)); *see also Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir.2006) (similar).

*A. First Factor: The Purpose and Character of the Use*

The first statutory factor in the fair-use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

■ *1. "Transformative" Use.* We have, post-*Campbell*, addressed and applied this first factor many times. In *Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir.2001), we described it this way:

The heart of the fair use inquiry is into the first specified statutory factor identified as "the purpose and character of the use." 17 U.S.C. § 107(1). This formulation, as the Supreme Court observed in *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164, draws on Justice Story's famous reference in *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D.Mass.1841) (No. 4901), to "the nature and objects of the selections made." As the *Campbell* Court explained,

The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersedes the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message ..., in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. *Such transformative works thus lie at the heart of the fair use doctrine's guarantee of breathing space ....* *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (emphasis added [in *Davis* ]) (alteration in original) (citations omitted).

*Id.* If "'the secondary use adds value to the original—if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights

and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.'" *Castle Rock Entm't,* 150 F.3d at 142 (quoting Leval, *supra,* at 1111; brackets in *Castle Rock* ).[3]

Koons does not argue that his use was transformative solely because Blanch's work is a photograph and his a painting, or because Blanch's photograph is in a fashion magazine and his painting is displayed in museums. He would have been ill advised to do otherwise. We have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work.[4] *See Davis,* 246 F.3d at 174 (use of plaintiff's eyewear in a clothing advertisement not transformative because it was "worn as eye jewelry in the manner it was made to be worn"); *Castle Rock Entm't,* 150 F.3d at 142–43 (quiz book called the *"Seinfeld* Aptitude Test" not transformative when its purpose was "to repackage [the television show] *Seinfeld* to entertain *Seinfeld* viewers"); *Ringgold v. Black Entm't Television, Inc.* 126 F.3d 70, 79 (2d Cir.1997) (copy of plaintiff's painting used as decoration for a television program's set not transformative because it was used for "the same decorative purpose" as the original).

But Koons asserts—and Blanch does not deny—that his purposes in using Blanch's image are sharply different from Blanch's goals in creating it. *Compare* Koons Aff. at ¶ 4 ("I want the viewer to think about his/her personal experience with these objects, products, and images and at the same time gain new insight into how these affect our lives.") *with* Blanch Dep. at 112–113 ("I wanted to show some sort of erotic sense[;] ... to get ... more of a sexuality to the photographs."). The sharply different objectives that Koons had in using, and Blanch had in creating, "Silk Sandals" confirms the transformative nature of the use. *See Bill Graham Archives,* 448 F.3d at 609 (finding transformative use when defendant's purpose in using copyrighted concert poster was "plainly different from the

**3.** As the Supreme Court noted in *Campbell,* however, a finding of transformativeness "is not absolutely necessary for a finding of fair use." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (citing *Sony Corp. of Am. v. Universal Studios, Inc.,* 464 U.S. 417, 455 n. 40, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)); *see also* 17 U.S.C. § 107 (listing "multiple copies for classroom use" as among the categories of potentially fair uses); Rebecca Tushnet, *Copy This Essay: How Fair Use Doctrine Harms Free Speech and How Copying Serves It,* 114 Yale L.J. 535, 555 (2004) (noting that historically some forms of "pure copying" were "at the core of fair use"). Nor is transformativeness necessarily the only important factor. *See Campbell,* 510 U.S. at 578, 114 S.Ct. 1164 ("[T]he four statutory factors ... [a]re all to be explored, and the results weighed together, in light of the purposes of copyright.").

**4.** It has been suggested that the exploitation of new, complementary markets is the hallmark of fair use. *See Ty, Inc. v. Publ'ns Int'l,* 292 F.3d 512, 517 (7th Cir.2002) ("[C]opying that is complementary to the copyrighted work (in the sense that nails are complements of hammers) is fair use, but copying that is a substitute for the copyrighted work (in the sense that nails are substitutes for pegs or screws), or for derivative works from the copyrighted work, is not fair use." (citation omitted)); *see also* 4–13 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[B][1] (2006) ("[I]f ... the defendant's work, although containing substantially similar material, performs a different function than that of the plaintiff's, the defense of fair use may be invoked."). But as the Seventh Circuit recognized, this reasoning is in tension with the Copyright Act's express grant to copyright holders of rights over derivative works. *See Ty, Inc.,* 292 F.3d at 518 ("Were control of derivative works not part of a copyright owner's bundle of rights, it would be clear that [defendant's] books fell on the complement side of the divide and so were sheltered by the fair-use defense."). A derivative use can certainly be complementary to, or fulfill a different function from, the original.

original purpose for which they were created"); *see also* 17 U.S.C. § 107(1) (first fair-use factor is the *"purpose* and character of the use" (emphasis added)).

■ Koons is, by his own undisputed description, using Blanch's image as fodder for his commentary on the social and aesthetic consequences of mass media. His stated objective is thus not to repackage Blanch's "Silk Sandals," but to employ it " 'in the creation of new information, new aesthetics, new insights and understandings.' " *Castle Rock Entm't,* 150 F.3d at 142 (quoting Leval, *supra,* 103 Harv. L.Rev. at 1111). When, as here, the copyrighted work is used as "raw material," *Castle Rock Entm't,* 150 F.3d at 142 (internal quotation marks and citation omitted), in the furtherance of distinct creative or communicative objectives, the use is transformative. *Id.; see also Bill Graham Archives,* 448 F.3d at 609 (use of concert posters "as historical artifacts" in a biography was transformative); *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109, 113 (2d Cir.1998) (parody of a photograph in a movie poster was transformative when "the ad [was] not merely different; it differ[ed] in a way that may reasonably be perceived as commenting" on the original).

The test for whether "Niagara's" use of "Silk Sandals" is "transformative," then, is whether it "merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (internal quotation marks and citation omitted, alteration incorporated); *Davis,* 246 F.3d at 174 (same). The test almost perfectly describes Koons's adaptation of "Silk Sandals": the use of a fashion photograph created for publication in a glossy American "lifestyles" magazine—with

changes of its colors, the background against which it is portrayed, the medium, the size of the objects pictured, the objects' details and, crucially, their entirely different purpose and meaning—as part of a massive painting commissioned for exhibition in a German art-gallery space. We therefore conclude that the use in question was transformative.

■ *2. Commercial Use.* Koons made a substantial profit from the sale of "Niagara." And "whether [the] use [in question] is of a commercial nature or is for nonprofit educational purposes" is an explicit part of the first fair-use factor. 17 U.S.C. § 107(1). In *American Geophysical Union v. Texaco Inc.,* 60 F.3d 913 (2d Cir. 1994), we said:

> The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work.
>
> Consistent with these principles, courts will not sustain a claimed defense of fair use when the secondary use can fairly be characterized as a form of commercial exploitation, i.e., when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material. Conversely, courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest. The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair.

*Id.* at 922 (internal quotation marks and citations omitted).

But the use at issue in *American Geophysical Union* was photocopying—"an untransformed duplication" of the copyrighted works. *Id.* at 923. And we later observed in *NXIVM Corp. v. Ross Inst.,* 364 F.3d 471 (2d Cir.2004), that

> The Supreme Court in *Campbell* rejected the notion that the commercial nature of [a] use could by itself be a dispositive consideration. The *Campbell* opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research ... 'are generally conducted for profit,'" *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 (quoting *Harper & Row,* 471 U.S. at 592, 105 S.Ct. 2218) (Brennan, J., dissenting), and that Congress "could not have intended" a rule that commercial uses are presumptively unfair. *Id.* The commercial objective of the secondary work is only a subfactor within the first factor. "The more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579, 114 S.Ct. 1164. Finding the work substantially transformative, the district court properly discounted the secondary commercial nature of the use. We agree.

*Id.* at 477–78; *see also Campbell,* 510 U.S. at 591, 114 S.Ct. 1164 ("When a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersedes the objects,' *Folsom v. Marsh,* 9 F. Cas. at 348, of the original and serves as a market replacement for it, making it likely that cognizable actionable market harm to the original will occur. But when, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred."); *Davis,* 246 F.3d at 174–75 (similar to *NXIVM Corp.*); *Leibovitz,* 137

F.3d at 113 (similar); *Am. Geophysical Union,* 60 F.3d at 921–22 (similar).

We do not mean to suggest that the commercialism of the use by the secondary user of the original is not relevant to the inquiry. But here, since the "new work" is "substantially transformative," *NXIVM Corp.,* 364 F.3d at 478, "the significance of other factors, [including] commercialism, are of [less significance]," *id.* (quoting *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164). We therefore "discount[ ] the secondary commercial nature of the use." *Id.*

It can hardly be said, moreover, that the defendants' economic gains from "Niagara" were "to the exclusion of broader public benefits." *Am. Geophysical Union,* 60 F.3d at 921–22. Notwithstanding the fact that artists are sometimes paid and museums sometimes earn money, the public exhibition of art is widely and we think properly considered to "have value that benefits the broader public interest." *Id.* at 922; *see also* 20 U.S.C. § 951 (stating that "access to the arts and the humanities" fosters "wisdom and vision" and makes citizens "masters of their technology and not its unthinking servants").

■ *3. Parody, Satire, and Justification for the Copying.* The secondary work in *Campbell* was a parody, and some of the language in the opinion, and some of the cases following it, *see, e.g., Leibovitz v. Paramount Pictures Corp., supra,* are specifically about parody. "Niagara," on the other hand, may be better characterized for these purposes as satire—its message appears to target the genre of which "Silk Sandals" is typical, rather than the individual photograph itself. *See Rogers,* 960 F.2d at 310 (concluding that a previous work by Koons was not a parody because "the copied work must be, at least in part, an object of the parody" and it was "difficult to discern [in Koons's work] any paro-

dy of the photograph ... itself"); *Campbell,* 510 U.S. at 581 n. 15, 114 S.Ct. 1164 ("Satire has been defined as a work 'in which prevalent follies or vices are assailed with ridicule,' 14 Oxford English Dictionary, ... at 500, or are 'attacked through irony, derision, or wit,' American Heritage Dictionary ... at 1604.").

We have applied *Campbell* in too many non-parody cases to require citation for the proposition that the broad principles of *Campbell* are not limited to cases involving parody. But the satire/parody distinction may nevertheless be relevant to the application of these principles. As the *Campbell* Court observed, "[p]arody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* at 580–81, 114 S.Ct. 1164.

It is not, of course, our job to judge the merits of "Niagara," or of Koons's approach to art. *See Campbell,* 510 U.S. at 582, 114 S.Ct. 1164 (" '[I]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of a work, outside of the narrowest and most obvious limits.' " (quoting *Bleistein v. Donaldson Lithographing Co.,* 188 U.S. 239, 251, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (Holmes, *J.*))). The question is whether Koons had a genuine creative rationale for borrowing Blanch's image, rather than using it merely "to get attention or to avoid the drudgery in working up something fresh." *Id.* at 580, 114 S.Ct. 1164. Although it seems clear enough to us that Koons's use of a slick fashion photograph enables him to satirize life as it appears when seen through the prism of slick fashion photography, we need not depend on our own poorly honed artistic sensibilities. Koons explained, without contradiction, why he used Blanch's image:

> Although the legs in the Allure Magazine photograph ["Silk Sandals"] might seem prosaic, I considered them to be necessary for inclusion in my painting rather than legs I might have photographed myself. The ubiquity of the photograph is central to my message. The photograph is typical of a certain style of mass communication. Images almost identical to them can be found in almost any glossy magazine, as well as in other media. To me, the legs depicted in the Allure photograph are a fact in the world, something that everyone experiences constantly; they are not anyone's legs in particular. By using a fragment of the Allure photograph in my painting, I thus comment upon the culture and attitudes promoted and embodied in Allure Magazine. By using an existing image, I also ensure a certain authenticity or veracity that enhances my commentary—it is the difference between quoting and paraphrasing—and ensure that the viewer will understand what I am referring to.

Koons Aff. at ¶ 12.[5] We conclude that Koons thus established a "justif[ication for] the very act of [his] borrowing." *Campbell,* 510 U.S. at 581, 114 S.Ct. 1164. Whether or not Koons could have created "Niagara" without reference to "Silk Sandals," we have been given no reason to question his statement that the use of an existing image advanced his artistic purposes.

■ *4. "Bad Faith."* Much has been written about whether good faith was deemphasized by the advent of *Campbell* or essentially written out of the first part of the fair-use test. The question was thoroughly explored by the majority and concurring opinions in *NXIVM Corp.,* 364 F.3d at 478–79; *id.* at 483–87 (Jacobs, J.,

5. Koons's clear conception of his reasons for using "Silk Sandals," and his ability to articulate those reasons, ease our analysis in this case. We do not mean to suggest, however, that either is a *sine qua non* for a finding of fair use—as to satire or more generally.

concurring). In any event, the only act of bad faith alleged here is that Koons used Blanch's photograph without first asking her permission. We are aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith. *See Harper & Row,* 471 U.S. at 562–63, 105 S.Ct. 2218 (purloined manuscript); *NXIVM Corp.,* 364 F.3d at 478 (breach of confidentiality agreement); *Rogers,* 960 F.2d at 309 (tearing off of copyright mark); *Weissmann v. Freeman,* 868 F.2d 1313, 1324 (2d Cir. 1989) ("total deletion of the original author's name and substitution of the copier's"). And as the *Campbell* Court noted by way of dictum, "If the use is otherwise fair, then no permission need be sought or granted." *Campbell,* 510 U.S. at 585 n. 18, 114 S.Ct. 1164; *see also Castle Rock Entm't,* 150 F.3d at 146 (2d Cir.1998) ("One factor that is of no relevance to the fair use equation, however, is defendants' continued distribution of [the defendants' work] after [the plaintiff] notified defendants of its copyright infringement claim, because '[i]f the use is otherwise fair, then no permission need be sought or granted .... [B]eing denied permission to use a work does not weigh against a finding of fair use.' ") (citing *Campbell,* 510 U.S. at 585 n. 18, 114 S.Ct. 1164) (other citation omitted). In light of that statement by the Supreme Court, it can hardly be said to have been an act of bad faith for Koons to have neither "sought [n]or [been] granted" permission for the use of "Silk Sandals" if, as we find, the use is "otherwise fair."

5. *Conclusions as to the First Factor.* Because Koons's appropriation of Blanch's photograph in "Niagara" was intended to

be—and appears to be—"transformative," because the creation and exhibition of the painting cannot fairly be described as commercial exploitation and the "commerciality" of the use is not dispositive in any event, and because there is insufficient indication of "bad faith," we agree with the district court that the first fair-use factor strongly favors the defendants.

B. *Second Factor: Nature of the Copyrighted Work*

■ The second statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). It "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell,* 510 U.S. at 586, 114 S.Ct. 1164.

> Two types of distinctions as to the nature of the copyrighted work have emerged that have figured in the decisions evaluating the second factor: (1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.

2 Howard B. Abrams, *The Law of Copyright,* § 15:52 (2006).

As noted, Blanch's "Silk Sandals" was published. Under the second of the two considerations mentioned by Abrams, that fact favors the defendants.[6]

---

**6.** We have said that when " 'the copyrighted [material is] unpublished, the second [fair-use] factor weighs heavily in favor' " of the plaintiff. *New Era Publ'ns Int'l, ApS v. Henry Holt and Co., Inc.,* 873 F.2d 576, 583 (2d Cir.1989) (quoting *Salinger v. Random House,* *Inc.,* 811 F.2d 90, 97 (2d Cir.), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987)), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990). "In 1992, however, Congress amended § 107 to state that: 'The fact that a work is unpublished

As for the first consideration, we disagree with the district court's characterization of Blanch's photograph as "banal rather than creative." *Blanch*, 396 F.Supp.2d at 482.[7] Accepting that "Silk Sandals" is a creative work, though, it does not follow that the second fair-use factor, even if it somewhat favors Blanch, has significant implications for on our overall fair-use analysis. As we recently explained, although "the creative nature of artistic images typically weighs in favor of the copyright holder," "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives*, 448 F.3d at 612; *cf. Campbell*, 510 U.S. at 586, 114 S.Ct. 1164 (stating that the second factor is rarely "likely to help much in separating the fair use sheep from the infringing goats in a parody case"). To paraphrase *Bill Graham Archives*, the second fair-use factor has limited weight in our analysis because Koons used Blanch's work in a transformative manner to comment on her image's social and aesthetic meaning rather than to exploit its creative virtues. *See Bill Graham Archives*, 448 F.3d at 612–13.

## C. Third Factor: Amount and Substantiality of the Portion Used

The third factor bearing on fair use is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The question is whether " 'the quantity and value of the materials used,' are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164 (quoting *Folsom*, 9 F. Cas. at 348); *see also id.* at 587, 114 S.Ct. 1164 (noting that analysis "calls for thought not only about the quantity of the materials used, but about their quality and importance, too."); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 73 (2d Cir.1999) (same).

As we have discussed in part II.3 of this opinion, above, Koons asserts that his artistic goals led him to incorporate preexisting images such as Blanch's photograph into his paintings in order to reference certain "fact[s] in the world." Koons Aff. at ¶ 12. The issue here is not "justification," which we addressed in part II.3. The question is whether, once he chose to copy "Silk Sandals," he did so excessively, beyond his "justified" purpose for doing so in the first place—whether the use was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164

It seems to us that Koons's copying of "Silk Sandals" was indeed reasonable when measured in light of his purpose, to convey the "fact" of the photograph to viewers of the painting, Koons Aff. at ¶ 12, and in light of the quantity, quality, and importance of the material used, *Campbell*, 510 U.S. at 587, 114 S.Ct. 1164. He did not copy those aspects of "Silk Sandals" "whose power lies in [Blanch's] individual-

shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.' " *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 204 (4th Cir.1998) (quoting 17 U.S.C. § 107). We have not had occasion to address the published/unpublished distinction since that amendment. *But see NXIVM Corp.*, 364 F.3d at 480 (the parties did not dispute that because the copyrighted work was unpublished, the second fair-use factor favored the plaintiffs).

7. The district court did not actually say that Blanch's photograph was banal, but rather that the elements of the photograph copied by Koons were banal. We think that the expressiveness of the copied elements is better considered as part of the third fair-use factor, the amount and substantiality of the portion used.

ized expression." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218. As Blanch testified in her deposition, her key creative decisions in the shoot were the choice of an airplane cabin as a setting and her placement of the female model's legs on the male model's lap. But neither the airplane background nor the man's lap appear in "Niagara." It depicts only the woman's legs and sandal-clad feet. In light of Koons's choice to extract the legs, feet, and sandals in "Silk Sandals" from their background, we find his statement that he copied only that portion of the image necessary to evoke "a certain style of mass communication," Koons Aff. ¶ 12, to be persuasive. We conclude that the amount and substantiality of Koons's copying was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. The district court said that "[t]he third factor is neutral as between the parties," *Blanch*, 396 F.Supp.2d at 482; we think that it weighs distinctly in Koons's favor. This modest difference in our views, however, does not alter our ultimate conclusion on fair use.

## D. Fourth Factor: Market Effects

 The fourth and final statutory factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).[8] "In considering the fourth factor, our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work." *NXIVM Corp.*, 364 F.3d at 481–82. "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592, 114 S.Ct. 1164.

Blanch acknowledges that she has not published or licensed "Silk Sandals" subsequent to its appearance in *Allure*, that she has never licensed any of her photographs for use in works of graphic or other visual art, that Koons's use of her photograph did not cause any harm to her career or upset any plans she had for "Silk Sandals" or any other photograph, and that the value of "Silk Sandals" did not decrease as the result of Koons's alleged infringement. In light of these admissions, it is plain that "Niagara" had no deleterious effect "upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).[9] The fourth fair-use factor greatly favors Koons.

8.
> The Supreme Court has recently retreated from its earlier cases suggesting that the fourth statutory factor is the most important element of fair use, *see Harper & Row*, 471 U.S. at 566, 105 S.Ct. 2218, recognizing instead that "all [factors] are to be explored, and the results weighed together, in light of the purposes of copyright," *Campbell*, 510 U.S. at 578, 114 S.Ct. 1164
> . . . .
> *Castle Rock Entm't*, 150 F.3d at 145.

9. We have sometimes found that the fourth factor favors the plaintiff even in the absence of evidence that the plaintiff has tapped, or even intends to tap, a derivative market. *See, e.g., Castle Rock Entm't*, 150 F.3d at 145–46 ("Although Castle Rock has evidenced little if any interest in exploiting this market for derivative works ... the copyright law must respect that creative and economic choice."). But nothing in the record here suggests that there was a derivative market for Blanch to tap into that is in any way related to Koons's use of her work, even if she dearly wanted to. And it is of course circular to assert simply that if we were to hold in her favor she could then charge Koons for his further use of "Silk Sandals." *See Am. Geophysical Union*, 60 F.3d at 929 n. 17 (" 'By definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties.' " (quoting Leval, *supra*, 103 Harv. L.Rev. at 1124)).

## CONCLUSION

Having explored the statutory factors and weighed them together in light of the purposes of copyright, *Campbell*, 510 U.S. at 78, we think that the district court's conclusion was correct—that copyright law's goal of "promoting the Progress of Science and useful Arts," U.S. Const., art. I, § 8, cl. 8, would be better served by allowing Koons's use of "Silk Sandals" than by preventing it, *see Castle Rock Entm't*, 150 F.3d at 141. We therefore conclude that neither he nor the other defendants engaged in or are liable for copyright infringement. We affirm the judgment of the district court.

hair" might be metallic eyeliner, highlighter on the cheekbones, or metal-flecked nails. This page: Live From New York...It's OPI nail polish by OPI. Silk sandals by Gucci. Stretch gabardine pants by Prada. Opposite: Oasis Bronze cream eye shadow, Bronze Glow blush, and Goldswept lipstick by Lancôme. Silk dress and sable jacket by Fendi. Eye mask by Gucci. Details, see Credits page.

A-141

KATZMANN, Circuit Judge, concurring.

I concur in the disposition of this case and appreciate the very considerable thinking in the majority opinion. I agree that Koons' work is highly transformative of Blanch's, using it as raw material for an entirely different type of art, and that his use of Blanch's work furthered a purpose (art that comments on existing images by juxtaposing them against others) that can make a finding of fair use appropriate. In both respects, the facts of this case are quite distinguishable from those of *Rogers v. Koons*, 960 F.2d 301 (2d Cir.1992), in which Koons slavishly recreated a copyrighted work in a different medium without any objective indicia of transforming it or commenting on the copyrighted work. Moreover, the fourth factor of the fair-use analysis dramatically favors Koons, in that Blanch failed to show that Koons' use of her work actually harmed her in any way. She thus stands in stark contrast to the plaintiff in *Rogers*, for whom licensing of his work in general, and the appropriated work in particular, yielded considerable revenue. On the facts of this case, it is easy to conclude that the copyright law's goals are better served by a finding of fair use.

I respectfully part company with the majority opinion, however, because I believe it sweeps more broadly in several places than is necessary to decide this simple case. For example, I see no need to state that we "discount[ ] the secondary commercial nature of the use." *See* Majority Op. at 254. This language was taken from *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 478 (2d Cir.2004), which used it in the context of applying our presumption

that the first factor favors the defendant where the use is for one of the purposes specifically listed in 17 U.S.C. § 107. Here, where Koons' use is not for one of the archetypal purposes specifically contemplated by Congress and such a presumption does not apply, it is uncertain whether we have license to "discount" its commercial nature, as opposed to balancing that consideration against the use's transformativeness and other countervailing concerns—particularly because consideration of a use's commercial nature (unlike its "transformativeness") is explicitly part of our statutory mandate. *See* 17 U.S.C. § 107(1).

Rather than reaching this question, I would simply apply our established analysis for weighing commercialism, *see Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922–23 (2d Cir.1994). As in *Am. Geophysical Union*, "the link between [the defendant's] commercial gain and [the defendant's] copying is somewhat attenuated," in that the copying of Blanch's work was simply one small part of what made Koons' work so valuable rather than the heart of the enterprise. *See* 60 F.3d at 922.

Similarly, there seems to be no need to rely so heavily on what the majority acknowledges is a sentence of dictum in a footnote in *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), to the effect that failure to seek authorization, even where doing so would have been feasible, is not relevant to the fair-use inquiry. *See* Majority Op. at 256–57. I see no reason, on these facts, to wade into the contentious battle over the role of good faith in the post-*Campbell* fair use inquiry. Instead, I would simply conclude that whatever bad

faith Koons may have exhibited in this case, as well as the limited commercial nature of his use, would not outweigh the much stronger considerations pointing toward a finding of fair use.

To be clear, I do not argue with the majority's thoughtful discussion of these points, except to question whether its conclusions are compelled by precedent. If and when I encounter a case that requires me to do so, I may well adopt them. I merely believe that this is not such a case, and so I do not now join what I regard as dicta as applied to these facts.

This is our Circuit's second encounter with Koons' work. His work, like that of other appropriation artists, inherently raises difficult questions about the proper scope of copyright protection and the fair-use doctrine. I would continue to answer those questions as necessary to decide particular cases, mindful that the fair-use inquiry is a fact-specific one that is "not to be simplified with bright-line rules." *Campbell,* 510 U.S. at 577, 114 S.Ct. 1164.