# United States Court of Appeals for the Federal Circuit

2009-5044


FRANK GAYLORD,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.


Anthony L. Fletcher, Fish & Richardson P.C., of New York, New York, argued for plaintiff-appellant.   On the brief was Heidi E. Harvey, of Boston, Massachusetts.

Scott Bolden, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were Tony West, Assistant Attorney General, John J. Fargo, Director.  Of counsel on the brief was Gary L. Hausken, Assistant Director.

Anthony T. Falzone, Stanford Law School, Center for Internet & Society, of Stanford, California, for amici curiae Andy Warhol Foundation for the Visual Arts, Inc., et al.  With him on the brief were Julie A. Ahrens, and Sarah Hinchliff Pearson.  Of counsel on the brief were Zachary Alinder and Erica Brand Portnoy, Bingham McCutchen LLP, of San Francisco, California.

Appealed from:  United States Court of Federal Claims

Judge Thomas C. Wheeler

# United States Court of Appeals for the Federal Circuit

2009-5044

FRANK GAYLORD,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 06-CV-539, Judge Thomas C. Wheeler.

_____

DECIDED:  February 25, 2010

_____

Before NEWMAN, MAYER, and MOORE, Circuit Judges.

Opinion for the court filed by Circuit Judge MOORE.  Dissenting opinion filed by Circuit Judge NEWMAN.

MOORE, Circuit Judge.

Mr. Frank Gaylord appeals the decision of the United States Court of Federal Claims that a stamp issued by the United States Postal Service made fair use of a copyrighted work, specifically, soldier sculptures in formation constituting part of the Korean War Veterans Memorial (Memorial).  The court determined that Mr. Gaylord was the sole author of the soldier sculptures and that his sculptures were not exempt from copyright protection under the Architectural Works Copyright Protection Act (AWCPA).  Because the court erred when it determined that the stamp made fair use of Mr. Gaylord's work, but it correctly determined that the government was not a joint author

and that the AWCPA did not bar an infringement suit, we affirm-in-part, reverse-in-part, and remand for a determination of damages.

BACKGROUND

This case arises from the Postal Service's decision to issue a 37-cent stamp depicting a portion of the Memorial. The path from the concept of the Memorial to the creation of the stamp spans more than 15 years.

In 1986, Congress enacted legislation to erect a memorial in Washington, D.C. to honor veterans of the Korean War. Authorization of Memorial, Pub. L. No. 99-572, § 1, 100 Stat. 3226 (1986). The legislation authorized the American Battle Monuments Commission (Commission) to establish the Memorial, and the Commission sponsored a contest to select the designer of the Memorial. A team from the Pennsylvania State University (the Penn State Team) won the contest with a proposal to create 38 larger-than-life granite soldiers in formation. According to the Penn State Team, "[f]rom a distance, one [would see] the Memorial as an elusive, dream-like presence of ghostly figures moving across a remote landscape." Although its original concept undoubtedly influenced the design of the Memorial, the Penn State Team eventually withdrew from the project.[1]

The Army Corps of Engineers selected Cooper-Lecky Architects, P.C. (Cooper-Lecky) as the prime contractor for the creation, construction, and installation of the Memorial. Cooper-Lecky sponsored a competition to select the sculptor for the Memorial. Mr. Gaylord, a nationally recognized sculptor, won the contest.

---

[1]     The members of the Penn State Team are not parties to this litigation, and no one has suggested that they have copyrights in the Memorial.

In 1990, Mr. Gaylord began work on the project. Although the Penn State Team's proposal called for 38 granite soldiers, "the final design featured 19 stainless steel statues representing a platoon of foot soldiers in formation," referred to as The Column. Gaylord, 85 Fed. Cl. at 63. Mr. Gaylord prepared successively larger models of the soldiers, transforming them along the way in response to critiques and suggestions by Cooper-Lecky, members of the Korean War Veterans Memorial Advisory Board (VAB), and the Commission on Fine Arts (CFA). Once Mr. Gaylord completed models for the soldiers, they were cast in stainless steel and installed at the site of the Memorial on the National Mall in Washington, D.C. At the suggestion of a member of the VAB, Mr. Gaylord staggered the statues, thereby creating the composition of The Column. Cooper-Lecky, the VAB, and the CFA all participated in incorporating The Column into the Memorial, which also includes landscaping, a mural, and granite plates representing the reflection of rice paddies at the soldiers' feet. A picture of The Column—taken on a sunny day—is below.



Mr. Gaylord received five copyright registrations relating to the soldier sculptures from 1990 to 1995. Each certificate listed Mr. Gaylord as the sole author. The registrations include pictures of the clay models for the sculptures as they evolved over the years, and eventually, the sculptures themselves. For example, in his November 11, 1993 registration, he described the work as clay "statuettes – fully approved – 19 soldiers – National Korean War Veterans Memorial." His August 12, 1994 registration concerned "19 7'-6" tall clay soldiers to be cast in stainless steel for the National Korean War Veterans Memorial on the mall in Washington, D.C." Shortly after the statues were installed, on May 1, 1995, Mr. Gaylord filed a certificate of copyright registration for the soldiers as they appeared before and after casting. This certificate included photographs of the soldiers as installed on the National Mall.

In 1995, shortly after the Memorial was dedicated, a photographer named John Alli took a photograph of the Memorial as a retirement gift for his father, a veteran of the Korean War. Mr. Alli visited the Memorial on five or six occasions, taking photographs at various times of year and day. One such visit occurred in January 1996 just after a snowstorm. Over the course of about two hours on that cold winter morning, Mr. Alli took about 100 photographs of the Memorial, including photographs of individual soldiers, from various angles using different exposures and lighting conditions. Mr. Alli selected one of his photographs for his father's retirement gift. The photograph, titled "Real Life," is reproduced below. No one questions that Mr. Alli is entitled to his own copyright protection in his photograph as a derivative work.



Mr. Alli decided to sell prints of the photograph. He therefore sought permission from the copyright owner of the underlying work, eventually locating Mr. Lecky of Cooper-Lecky, who held himself out as the "outright" owner of the copyright. Mr. Alli agreed to pay a 10% royalty on sales of prints of his photographs to a licensing entity established by Mr. Lecky. Mr. Lecky did not notify Mr. Gaylord about the agreement with Mr. Alli.[2]

In 2002, the Postal Service decided to issue a 37-cent stamp commemorating the 50th anniversary of the armistice of the Korean War. The Postal Service selected Mr. Alli's photograph for the stamp and paid him $1500 for its use. Mr. Alli told the Postal Service that it would need the permission of the owner of the copyright of the underlying work and referred the Postal Service to Mr. Lecky.

---

[2] In 2006, Mr. Gaylord sued Mr. Alli for copyright infringement. Mr. Alli settled the dispute and agreed to pay Mr. Gaylord 10% of his net sales.

The Postal Service issued the stamp, titled "Korean War Veterans Memorial." The stamp features Mr. Alli's photo and depicts 14 of the 19 soldier sculptures (see below).



The Postal Service produced approximately 86.8 million stamps before retiring the stamp on March 31, 2005. The Postal Service acknowledged that it received over $17 million from the sale of nearly 48 million stamps. It was estimated that in 2003, the Postal Service generated $5.4 million from the sales of stamps to collectors who did not use the stamps to send mail. In addition, the Postal Service sold retail goods such as commemorative panels and framed art featuring images of the stamp. It did not seek or obtain Mr. Gaylord's permission to use the sculptures in the stamp or in any related retail goods.

Mr. Gaylord sued the government in the Court of Federal Claims on July 25, 2006, alleging infringement of his copyright. On June 16-20, 2008, the Court of Federal Claims conducted a trial, at which the government argued that the stamp made fair use of the work, excepting it from copyright liability. The government further argued that it

had rights to the work as a joint author, which would provide it an unlimited license in the work. Finally, the government argued that the stamp fell under the exclusion from liability for copyright infringement for architectural works under the AWCPA. The Court of Federal Claims determined that Mr. Gaylord was the sole copyright owner of The Column and that The Column did not qualify as an architectural work under the AWCPA. Gaylord v. United States, 85 Fed. Cl. 59, 67, 72 (2008). However, the Court of Federal Claims also determined that the government was not liable for copyright infringement because the government's use of The Column was fair use. Id. at 71. Mr. Gaylord appeals the court's decision as to fair use, and the government challenges the court's determinations of ownership and the inapplicability of the AWCPA. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error. Columbia Gas Sys., Inc. v. United States, 70 F.3d 1244, 1246 (Fed. Cir. 1995). Infringement requires two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). The government does not dispute the validity of the copyright or that the stamp copied original elements of The Column. This appeal concerns whether the government can establish fair use, ownership rights through a joint author, or an exemption to liability under the AWCPA.

### I.     Fair Use

Fair use of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or

research, is not an infringement of copyright." 17 U.S.C. § 107. "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster.'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994) (alteration in original) (citation omitted).

Fair use is a mixed question of law and fact. Harper & Row, Publishers, Inc. v. Nation Enter., 471 U.S. 539, 560 (1985). Because "the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." Id. at 560 (citation omitted). Section 107 requires courts to consider four nonexclusive factors when evaluating fair use:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

35 U.S.C. § 107. Each factor is "to be explored, and the results weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 577.

### A. Purpose and Character of the Infringing Use

When evaluating the purpose and character of the use, one must consider "whether the new work merely 'supersede[s] the objects' of the original creation or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" Id. at 579. Although "transformative use

is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." Id. (citation omitted).

The Court of Federal Claims concluded that this factor weighed heavily in favor of fair use because the stamp was transformative. Gaylord, 85 Fed. Cl. at 69. The court determined that "while both the Stamp and 'The Column' are intended to honor veterans of the Korean War, the Stamp is transformative, providing a different expressive character than 'The Column.'" Id. at 68. It explained that Mr. Alli transformed the three-dimensional sculpture with his photograph by "creating a surrealistic environment with snow and subdued lighting where the viewer is left unsure whether he is viewing a photograph of statues or actual human beings." Id. at 68-69. The court determined that the Postal Service further transformed The Column by "making it even grayer, creating a nearly monochromatic image. This adjustment enhanced the surrealistic expression ultimately seen in the Stamp by making it colder." Id. at 69. The Court of Federal Claims concluded that the stamp was "a transformative work, having a new and different character and expression than Mr. Gaylord's 'The Column.'" Id.

We disagree. As a preliminary matter, we note that the inquiry must focus on the purpose and character of the stamp, rather than that of Mr. Alli's photograph. The stamp does not reflect any "further purpose" than The Column. See Campbell, 510 U.S. at 579. As the Court of Federal Claims found, both the stamp and The Column share a common purpose: to honor veterans of the Korean War.

Works that make fair use of copyrighted material often transform the purpose or character of the work by incorporating it into a larger commentary or criticism. For example, in Blanch v. Koons, an artist incorporated a copyrighted photograph of a woman's feet adorned with glittery Gucci sandals into a collage "commenting on the 'commercial images . . . in our consumer culture.'" 467 F.3d 244, 248 (2d Cir. 2006). The court determined that this was fair use in part because the collage was transformative. Id. at 252-53. It reasoned that the collage and the photo had "sharply different" purposes and that the collage was intended to be a "commentary on the social and aesthetic consequences of mass media." Id. Such transformation of a copyrighted work into a larger commentary or criticism fall squarely within the definition of fair use.

The government points to Lennon v. Premise Media Corp., 556 F. Supp. 2d 310 (S.D.N.Y. 2008), as an example of a case where a secondary use was deemed transformative fair use without commenting on the original. In Lennon, defendants-filmmakers used a 15-second clip of John Lennon's "Imagine" that they believed envisioned a world without religion. Id. at 322 ("Nothing to kill or die for/And no religion too"). The filmmakers played this audio clip while showing Cold War-era images of marching soldiers and an image of Stalin, "express[ing] the filmmakers' view that the song's secular utopian vision 'cannot be maintained without realization in a politicized form' and that the form it will ultimately take is dictatorship." Id. at 323. The court concluded that "[t]he movie thus use[d] the excerpt of 'Imagine' to criticize what the filmmakers see as the naïveté of John Lennon's views." Id. This use appears clearly

transformative, and (as in <u>Blanch</u>) falls safely within the definition of fair use. By contrast, here the stamp did not use The Column as part of a commentary or criticism.[3]

We conclude that the stamp does not transform the character of The Column. Although the stamp altered the appearance of The Column by adding snow and muting the color, these alterations do not impart a different character to the work. To the extent that the stamp has a surreal character, The Column and its soldiers themselves contribute to that character. Indeed, the Penn State Team suggested that the Memorial have a "dream-like presence of ghostly figures." Capturing The Column on a cold morning after a snowstorm—rather than on a warm sunny day—does not transform its character, meaning, or message. Nature's decision to snow cannot deprive Mr. Gaylord of an otherwise valid right to exclude.

Analysis of the purpose and character of the use also includes whether the "use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107. The Postal Service acknowledged receiving $17 million from the sale of nearly 48 million 37-cent stamps. An estimated $5.4 million in stamps were sold to collectors in 2003. The stamp clearly has a commercial purpose. The Court of Federal Claims did not address how the commercial purpose of the stamp affected this factor of the fair use analysis.

---

[3] Nor does the stamp incorporate The Column into a larger biographical work. "[C]ourts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." <u>Bill Graham Archives v. Dorling Kindersley Ltd.</u>, 448 F.3d 605, 609 (2d Cir. 2006); <u>see also</u> <u>Hofheinz v. A&E Television Networks</u>, 146 F. Supp. 2d 442, 446-47 (S.D.N.Y. 2001).

Because the stamp did not have a further purpose or different character, and because it had a commercial use, we conclude that this factor weighs strongly against fair use.

## B.    Nature of the Copyrighted Work

We next consider the nature of the copyrighted work, The Column.  "This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  Campbell, 510 U.S. at 586.  Relevant to this factor, courts consider:  "(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower."  Blanch, 467 F.3d at 256.

The Court of Federal Claims acknowledged the expressive and creative nature of The Column, which weighs against fair use.  Gaylord, 85 Fed. Cl. at 69.  We see no clear error in the Court of Federal Claims' finding that The Column is expressive and creative.  However, it noted that "when a creative work has been copied, the second factor may be of limited utility to the fair use analysis where the challenged work is transformative."  Id. (citing Blanch, 467 F.3d at 257).  Therefore, because it had previously determined that the stamp was transformative, it gave this factor "limited weight" in its fair use analysis.  Id.

In Blanch, the Court of Appeals for the Second Circuit determined that the creative nature of a copyrighted work had limited weight in the fair use analysis because the secondary work used the original "in a transformative manner to comment on her

image's social and aesthetic meaning rather than to exploit its creative virtues." 467 F.3d at 257. In this case, the stamp did not use The Column in a transformative manner—the purpose and character of the use were identical. Thus, we see no reason to discount the expressive and creative nature of The Column.

Although The Column is part of a national monument—perhaps the epitome of a published work—given the overall creative and expressive nature of the work, we conclude that this factor weighs against fair use. See Twin Peaks Prods., Inc. v. Publ'n Int'l, Ltd., 996 F.2d 1366, 1376 (2d Cir. 1993) (concluding that for a very successful, published, creative work, this factor weighed against fair use).

### C. The Amount and Substantiality of the Portion Used

The third factor concerns whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." Campbell, 510 U.S. at 587. Courts consider both the quantity and quality of the materials used. Id.

As to the quantity, the Court of Federal Claims found that the stamp depicted a substantial number (14 of the 19) of the soldier sculptures, weighing against fair use. As to the quality, the court determined that "Mr. Alli and the Postal Service used variables to lessen the quality and importance of 'The Column' and to alter the expression of the Stamp," changing "the qualitative message of 'The Column.'" Gaylord, 85 Fed. Cl. at 70. The court concluded that while the use of many of the soldier statues weighed against fair use, the weight of this factor was "somewhat mitigated" by the quality and importance of the statues to the stamp. Id.

We agree that the government's use of many of the soldiers in the stamp weighs against fair use, however, we disagree that the weight is mitigated by the quality and importance of The Column to the stamp. The Column constitutes the focus—essentially the entire subject matter—of the stamp. The stamp itself is titled "Korean War Veterans Memorial." Although the snow and muted coloring lessen the features of the soldier sculptures, the stamp clearly depicts an image of The Column. Thus, we conclude that this factor weighs against fair use.

### D.     Market Impact

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor requires courts to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market." Campbell, 510 U.S. at 590 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4] (1993)). "In evaluating this factor, a court must consider not only the primary market for the copyrighted work, but the current and potential market for derivative works." Twin Peaks, 996 F.2d at 1377.

The Court of Federal Claims found that the stamp caused no harm to either the value of The Column or the market for derivative works. Gaylord, 85 Fed. Cl. at 70. It noted that Mr. Gaylord conceded that the stamp actually increased the value of The Column. Id. The court further determined that the stamp did not impact Mr. Gaylord's prior efforts to market derivative works, and that it was not likely to impact such efforts in the future because the stamp was an inadequate market substitute for The Column. Id. at 70-71. The court reasoned that the stamp was analogous to the thumbnail images in Kelly v. Arriba Soft Corp., 336 F.3d 811, 821 (9th Cir. 2003), and Perfect 10, Inc. v.

Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007). The court therefore concluded that this factor weighed in favor of fair use. Gaylord, 85 Fed. Cl. at 71.

We see no clear error in the court's determination that the stamp has not and will not adversely impact Mr. Gaylord's efforts to market derivative works of The Column. Someone seeking to take a photograph of The Column or otherwise create a derivative work would not find the stamp to be a suitable substitute for The Column itself. Thus, we agree that this factor favors fair use.

### E.  No Fair Use

Weighing the factors, we conclude that the government's use of The Column in the stamp was not a fair use. Even though the stamp did not harm the market for derivative works, allowing the government to commercially exploit a creative and expressive work will not advance the purposes of copyright in this case. We turn now to whether The Column is a joint work or governed by the AWCPA.

### II.  Joint Authorship

The government asserts that it has rights to The Column through the contributions of Cooper-Lecky, the VAB, and/or the CFA (collectively, the government entities). Joint authors each possess an independent right to use or license the copyrighted work, subject only to a duty to account to the other coauthor(s) for any profits earned on the work. Cmty. for Creative Non-Violence v. Reid, 846 F.2d 1485, 1498 (D.C. Cir. 1988) (CCNV), aff'd, 490 U.S. 730 (1989). Cooper-Lecky granted the government a license to use any work that Cooper-Lecky might hold copyright in, and the VAB and CFA are government entities. Thus, if Cooper-Lecky, the VAB, or the CFA are joint authors with Mr. Gaylord, the government would have a right to use The

Column free from Mr. Gaylord's claims of infringement, subject to its duty to account to Mr. Gaylord.

On appeal, the government alleges that the trial court erred by misreading the certificates of registration, by failing to treat the presumption of validity as rebuttable, and by concluding that The Column was not a joint work. We conclude that the Court of Federal Claims treatment on each issue was proper.

The Court of Federal Claims first noted that Mr. Gaylord was entitled to a prima facie presumption of the validity of his copyright registrations. Gaylord, 85 Fed. Cl. at 66; see also 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court."). On appeal, the government challenges this presumption, arguing that statements of Mr. Gaylord's sole authorship are rendered facially ambiguous because certain of his copyright registration certificates indicate that the underlying work was "fully approved" or "[f]ully approved by all federal commissions." These notations appear in the section titled "Nature of Authorship," describing the nature of the work, rather than in the space provided for the "Name of Author." The statements of approval do not undermine Mr. Gaylord's assertions on his registration forms that he is the sole author of The Column. Approval—much like comment and criticism—does not amount to authorship. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1370 (Fed. Cir. 2007).

The government next argues that the Court of Federal Claims erred by failing to treat the presumption of validity as rebuttable. It asserts that "Gaylord bears the burden of establishing sole ownership of 'The Column'" because "the court should have shifted the burden back to Gaylord in light of the government's evidence." We disagree. The Court of Federal Claims thoroughly discussed the government's evidence and concluded that "Defendant's proffered contributions of the various committees to 'The Column' are not evidence of joint ownership, but rather of suggestion and criticism." Gaylord, 85 Fed. Cl. at 67. The Court of Federal Claims committed no error in its treatment of the burdens or in the presumption of validity—the court treated the presumption as unrebutted, not unrebuttable.

Finally, the government argues that the Court of Federal Claims erred in not concluding that the copyright at issue was a joint work. We see no clear error in the Court of Federal Claims' finding that The Column is not a joint work. "A 'joint work' is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. Authorship is a question of fact. S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1086 (9th Cir. 1989); see also Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc., 290 F.3d 98, 110 (2d Cir. 2002).

Joint authorship requires "an original work of authorship" from each author. CCNV, 846 F.2d at 1495. "To be an author, one must supply more than mere direction or ideas: one must 'translate [] an idea into a fixed, tangible expression entitled to copyright protection.'" S.O.S., 886 F.2d at 1087 (quoting CCNV, 490 U.S. at 737); see also PODS, 484 F.3d at 1370 ("Mere participation in, contributions to, and review of the

work of [another person] would not necessarily create a joint work."). As a general rule, each joint author must make an independently copyrightable contribution to the work.[4] See Aalmuhammed v. Lee, 202 F.3d 1227, 1234 (9th Cir. 1999); Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998); Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1071 (7th Cir. 1994); M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493 (11th Cir. 1990). Thus, "[a] co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Thomson, 147 F.3d at 200.

The government argues that the contributions of the various government entities merged with Mr. Gaylord's contributions to create a joint work, analogizing to CCNV, 846 F.2d 1485. In CCNV, the Community for Creative Non-Violence (CCNV) decided to sponsor a display to "dramatize the plight of the homeless." CCNV, 846 F.2d at 1487. Members of the CCNV conceived of a detailed plan for the display, involving a modern Nativity scene depicting two homeless adults and one infant huddling for warmth over a steam grate placed atop a pedestal from which simulated steam would flow through the grate. Id. The CCNV also decided that the display would include a shopping cart containing the belongings of the homeless family. Id. at 1497 n.16. A sculptor, James Earl Reid, sculpted the three human figures and the shopping cart, making changes

---

[4] The Seventh Circuit carved out an "exception" to this rule in a case where neither collaborator made independently copyrightable contributions, but the result of the collaboration produced a copyrightable work. Gaiman v. McFarlane, 360 F.3d 644, 658 (7th Cir. 2004). The court explained that "it would be paradoxical if though the result of [the contributors'] joint labors had more than enough creativity and originality to be copyrightable, no one could claim copyright." Id. Because the government does not argue that Mr. Gaylord's work was not worthy of copyright protection, this exception does not apply here.

along the way to accommodate CCNV's requests. Id. at 1487-88. A cabinetmaker created the steam grate pedestal. Id. at 1488. The two portions were joined and the entire work was placed on display. Id. A dispute later arose over the copyright in the work, and CCNV sought a declaration of copyright ownership. Id. The primary issue in the case was whether the display was a work made for hire, which would have given CCNV rights to the display. The United States Court of Appeals for the District of Columbia Circuit concluded that the display was not a work made for hire because the statutory requirements set forth in 17 U.S.C. § 101(2) were not met, but remanded for the lower court to determine whether CCNV might have rights as a joint author. Id. at 1494-98. It noted that CCNV contributed the steam grate pedestal, created the initial concept of the display, and provided ongoing direction of the realization of the display. Id. at 1497. It also noted "various indicia of the parties' intent, from the outset, to merge their contributions into a unitary whole, and not to construct and separately preserve discrete parts as independent works." Id.

The Supreme Court granted certiorari and determined that the display was not a work made for hire, but noted that "CCNV nevertheless may be a joint author of the sculpture if, on remand, the District Court determines that CCNV and Reid prepared the work 'with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.'" Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 753 (1989). The case settled without a decision on the merits of the joint authorship issue. See Cmty. for Creative Non-Violence v. Reid, Civ. No. 86-1507, 1991 WL 415523 (D.D.C. Jan. 7, 1991).

The government asserts that the facts of CCNV are "nearly identical" to this case. As an analogy to the steam grate pedestal that CCNV contributed, the government points to the physical contributions of Cooper-Lecky: a reflecting pool, landscaping around The Column, and irregular polished granite bands representing rice paddies. Notably, none of these features appear in the stamp. Even more notably, none of these features appear in the copyright that Mr. Gaylord obtained. Cooper-Lecky's physical contributions relate to the Memorial as a whole, not The Column. Mr. Gaylord did not copyright the Memorial. His copyright does not include the reflecting pool, the landscaping, or the rice paddies. The copyright over which we are deciding ownership is the copyright of The Column. None of these contributions by Cooper-Lecky establish entitlement to joint authorship over The Column—they are completely independent from the copyrighted matter in this case.

Focusing on The Column, the government lists several contributions by Cooper-Lecky, the VAB, and the CFA as evidence of joint authorship. The VAB created the story of each soldier, including the ethnicity, military service, and equipment representative of soldiers in the Korean War. At one point, the VAB told Mr. Gaylord to change the ethnicity of one soldier from Italian to Hispanic. The VAB also told Mr. Gaylord to sculpt certain soldiers clean shaven and others with buckled chin-straps. Although the government argues that Mr. Gaylord, Mr. Nelson, and Cooper-Lecky all decided that the soldiers would wear ponchos, we see no clear error in the Court of Federal Claims' finding that "the poncho concept was based on models produced by Mr. Gaylord." Gaylord, 85 Fed. Cl. at 67. According to the government, Cooper-Lecky instructed Mr. Gaylord to reduce the amount of wind in the ponchos and to reduce the

age of the soldiers by removing wrinkles from their faces. Cooper-Lecky and the CFA had Mr. Gaylord change the position of the first soldier in The Column from a celebratory squatting pose to standing. Finally, a member of the VAB suggested that Mr. Gaylord stagger the placement of the statues in formation. The government asserted that Cooper-Lecky, the VAB, and the CFA "each collaborated to modify the entire compositional structure and setting of 'The Column.'" Id. at 66. The Court of Federal Claims found, however, that "Mr. Gaylord created the composition of 'The Column,' using Colonel Bill Weber's [a member of the VAB] suggestion to stagger the statues." Id. The Court of Federal Claims addressed the contributions of Cooper-Lecky, the VAB, and the CFA and concluded that they did not constitute evidence of joint authorship "but rather of suggestion and criticism." Id. at 67. The court explained that "Mr. Gaylord was able to translate the competing and conflicting ideas, comments, and suggestions of multiple committee members into a new set of figures." Id. The Court of Federal Claims' conclusions regarding the contributions by Mr. Gaylord and the government entities are not clearly erroneous. While the government entities provided some direction and ideas, this effort did not rise to the level necessary for a joint work.

If one commissioned a work for a cowboy riding a horse, that contribution would not constitute copyrightable expression. See 17 U.S. C. § 102(b) (no copyright protection for ideas). If one later instructed the artist to depict the cowboy as weathered, wearing a cowboy hat, and riding slowly in calm wind, that would not rise to the level of copyrightable expression. See S.O.S., 886 F.2d at 1087 ("A person who merely describes to an author what the commissioned work should do or look like is not a joint author for purposes of the Copyright Act."). The contributions to The Column by

Cooper-Lecky, the VAB, and the CFA amount to no more here. The VAB may have suggested ethnicities and equipment to make the soldiers appear representative of those in the Korean War, but it was Mr. Gaylord who transformed those ideas into copyrightable expression. Cooper-Lecky may have suggested that Mr. Gaylord depict more youthful soldiers with less wind in their ponchos, but those ideas are not copyrightable. The government makes much of Cooper-Lecky's role in changing the stance of the first soldier. But as the Court of Federal Claims found, upon receiving suggestions and criticism from Cooper-Lecky and members of the committees, Mr. Gaylord transformed the statues himself. The Court of Federal Claims did not apply a "sole laborer" test as the government alleges, rather, it found that the contributions made by Cooper-Lecky, the VAB, and the CFA to The Column do not amount to independently copyrightable expression. We see no clear error in the Court of Federal Claims' conclusion that Mr. Gaylord is the sole author and sole owner of the copyright in The Column.

Moreover, the Court of Federal Claims determined that the parties never intended to create a joint work in The Column, as distinct from the Memorial. Gaylord, 85 Fed. Cl. at 67. Section 101 requires that a joint work "is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. We see no clear error in the Court of Federal Claims' determination that Cooper-Lecky and Mr. Gaylord did not intend The Column to be a joint work. As the Court of Federal Claims indicates, "The history of 'The Column' project thus shows an open and contentious dispute regarding copyright ownership, ultimately with [Cooper-Lecky's] concession that Mr. Gaylord was

the sole owner of the copyright." Gaylord, 85 Fed. Cl. at 67. In 1994, before the soldier statues were cast in their final form, Cooper-Lecky and Mr. Gaylord agreed that "[t]he copyright for this work will be held by the Artist [Mr. Gaylord]." The agreement goes on to specify that the terms of the use of the copyright are articulated under a separate contract. The 1994 agreement was signed by Mr. Lecky of Cooper-Lecky on January 27, 1994, and by Mr. Gaylord on February 7, 1994. According to the government, the final full-sized soldiers were created in August 1994.

The separate agreement referenced in the 1994 contract is a 1995 agreement in which Mr. Gaylord granted Cooper-Lecky royalty-bearing licensing rights in Mr. Gaylord's copyrighted work. The agreement acknowledged the separate contributions of Cooper-Lecky and Mr. Gaylord to the Memorial, which the agreement characterized as a collective work. The 1995 agreement, like the 1994 agreement, recognizes that Mr. Gaylord "is the sole author of the soldier sculptures to become part of the overall Memorial." The government asserts that the 1995 agreement cannot dispose of the authorship dispute because it arose after Mr. Gaylord created the final full-sized soldiers, and copyright ownership vests at the moment the work is fixed in any tangible form. Although it arose after the creation of the statues in their final form, the 1995 agreement reflects the understandings of Cooper-Lecky and Mr. Gaylord with respect to authorship of The Column and ownership of its copyright. The 1995 agreement crystallizes the intentions of the parties, which are manifest from the 1994 agreement and actions of the parties preceding the creation of The Column. We see no clear error in the Court of Federal Claims' determination that the parties never intended The Column to be a joint work.

The dissent argues that the government escapes liability for copyright infringement either by virtue of a contract with Cooper-Lecky or 28 U.S.C. § 1498. These issues were raised sua sponte by the dissent—we received no argument or briefing on either issue. The government cannot escape liability under its DACA31-90-C-0057 contract because Mr. Gaylord is not a party to that contract. Moreover, neither section of DACA31-90-C-0057 cited by the dissent concerns works by Mr. Gaylord. Section I-28 concerns works to which Cooper-Lecky could assert or establish authorship. Section I-29 concerns works made for hire, and the government has not provided any evidence establishing that The Column was a work made for hire. See 17 U.S.C. §§ 101, 201. Nor can the government escape liability under 28 U.S.C. § 1498, because there is no evidence that Mr. Gaylord created The Column in the service of the United States or using government time, material, or facilities. We decline to engage in appellate fact-finding to cobble together an excuse for the government's copyright infringement.

We conclude that the Court of Federal Claims did not clearly err in determining that authorship of The Column rested solely with Mr. Gaylord.

### III.    Architectural Works

The government asserts that it should escape liability because The Column is an architectural work. The AWCPA "did not afford architectural works full copyright protection; rather, it exempted the making of pictorial representations of architectural works from copyright infringement." Leicester v. Warner Bros., 232 F.3d 1212, 1217 (9th Cir. 2000). The AWCPA provides:

> The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the

work, if the building in which the work is embodied is located in or ordinarily visible from a public place.

17 U.S.C. § 120(a). Thus, if The Column is an architectural work under § 120, then Mr. Gaylord's copyright does not extend to pictorial representations of his work.

The Copyright Act defines an architectural work as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101. The applicable regulation defines buildings as "humanly habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions." 37 C.F.R. § 202.11(b)(2). The definition excludes "[s]tructures other than buildings, such as bridges, cloverleafs, dams, walkways, tents, recreational vehicles, mobile homes, and boats." Id. § 202.11(d)(1).

The Court of Federal Claims found that The Column is not a building, and therefore it is not an architectural work governed by the AWCPA. The court explained that the work "is an artistic expression intended to convey a message rather than to be occupied by individuals . . . . Much like a walkway or a bridge, the memorial permits individuals to access through it, but is not intended for occupancy." Gaylord, 85 Fed. Cl. at 72. We see no clear error in the court's determination that The Column is not an architectural work under the AWCPA.

CONCLUSION

For the foregoing reasons, we reverse the court's decision with respect to fair use, affirm its conclusions that the government does not have rights as a joint owner

and that The Column is not an architectural work under the AWCPA, and remand for a determination of damages.

AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED

# United States Court of Appeals for the Federal Circuit

2009-5044

FRANK GAYLORD,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 06-CV-539, Judge Thomas C. Wheeler.

NEWMAN, <u>Circuit Judge</u>, dissenting.

The Korean War Veterans Memorial is a work of public art and a national monument. It was authorized by Congress, installed on the National Mall, and paid for by appropriated funds. My colleagues on this panel now hold that the persons who produced this public monument for the United States, under a contract which requires that copyright is in the United States, can nonetheless require the United States to pay damages for copyright infringement based on use of a photograph of the Memorial in snow on a postage stamp. This holding is contrary to the contract provisions, contrary to statute for works done in the service of the United States, contrary to copyright law, and contrary to national policy governing access to public monuments. I respectfully dissent from the court's holding that

the United States is liable for infringement of an improperly obtained and unlawfully enforced copyright.

DISCUSSION

The United States, through the Department of the Army, entered into Architect-Engineer Contract No. DACA31-90-C-0057 (April 11, 1990), with Cooper-Lecky Architects as the prime contractor, to design and then to build the Korean War Veterans Memorial. After various procedures, Mr. Frank C. Gaylord was selected as the sculptor for The Column, a collection of nineteen larger-than-life steel soldiers, which was the focal point of the Memorial. Several groups, including the Korean War Veterans Memorial Advisory Board, the American Battle Monuments Commission, the National Capital Planning Commission, the National Capital Memorial Commission, and the Fine Arts Commission, were active participants in the design of the Memorial. The Memorial is a powerful and beautiful achievement. My colleagues rule that the United States is liable for copyright infringement by placing a photograph of the Memorial on a postage stamp.[1] However, my colleagues on this panel are incorrect in ruling that the United States has no right to use an image of the Memorial for governmental purposes.

I

The Contract between the United States and Cooper-Lecky Architects bars them from "assert[ing] or authoriz[ing] others to neither assert any rights nor establish any claim under the design patent or copyright laws." DACA31-90-C-0057 (April 11, 1990). The contract contains the following provisions with respect to copyright:

---

[1] The photographer, Mr. John Alli, was paid for the use of his photograph on the stamp. The record states that Mr. Alli paid Mr. Gaylord a royalty on all receipts based on this photograph.

I-28 GOVERNMENT RIGHTS (UNLIMITED) (MAR 1979).
The Government shall have unlimited rights, in all drawings, designs, specifications, notes and other works developed in the performance of this contract, including the right to use same on any other Government design or construction without additional compensation to the Contractor. The contractor hereby grants to the Government a paid-up license throughout the world to all such works to which he may assert or establish any claim under design patent or copyright laws . . .

I-29 DRAWINGS AND OTHER DATA TO BECOME PROPERTY OF GOVERNMENT (MAR 1979).
All designs, drawings, specifications, notes and other works developed in the performance of this contract shall become the sole property of the Government . . . . The Government shall be considered the "person for whom the work was prepared" for the purpose of authorship in any copyrightable work under 17 U.S.C. §201(b). With respect thereto, the contractor agrees not to assert or authorize others to assert any rights nor establish any claim under the design patent or copyright laws . . . .

The term "works" includes "graphic and sculptural works," DFARS 252.227-7020(a), and it is not disputed that the graphic and sculptural works of the Memorial are included in this definition. The Contract refers to §201(b), which provides as follows:

17 U.S.C. §201(b) Works made for hire.
In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

No such "written instrument" has been shown. To the contrary, the United States has consistently declared its copyright ownership with respect to the Memorial. The Contracting Officer has demanded the assignment of any copyrights that Cooper-Lecky or Mr. Gaylord has obtained. See infra. These are the copyrights that this court now holds to be enforceable against the United States.

In addition, 28 U.S.C. §1498(b) bars copyright enforcement against the United States under the conditions that here exist. This statute provides that:

2009-5044                                    3

> Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, . . the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages …: *Provided, however*, That this subsection shall not confer a right of action on any copyright owner or any assignee of such owner with respect to any copyrighted work prepared by a person while in the employment or service of the United States . . . or in the preparation of which Government time, material, or facilities were used . . . .

28 U.S.C. §1498(b). This is the statute under which Mr. Gaylord brought this suit. Thus, even if Mr. Gaylord held a valid copyright, enforcement against the United States is barred by the terms of this statute, for the sculptures were prepared "in the service of the United States," and "Government time, material, or facilities were used." Work "in the service of the United States" does not require being an "employee," and "one may have a 'service' relationship with the federal government that does not constitute an 'employment relationship'," as explained in Walton v. United States, 551 F.3d 1367, 1370 (Fed. Cir. 2009) (federal prisoner was in "service of the United States" for artistic work for which he received compensation).

Mr. Gaylord's position as subcontractor under the prime contract with Cooper-Lecky plainly, without dispute, places this work in the service of the United States. This contract established the relationship between the United States and the prime contractor Cooper-Lecky and subcontractors including Mr. Gaylord, and identified the United States as the "person for whom the work was prepared" pursuant to 17 U.S.C. §201(b). The various federal agencies oversaw the overall design of the Memorial and The Column, and provided design details of the soldiers, their ethnicity, their military rank, their equipment, their arrangement. These collaborators oversaw, on behalf of the United States, the work

for which Mr. Gaylord had been hired. Although the panel majority argues that this does not convert them into joint authors, that is irrelevant to the undisputed fact that this work was done in the service of the United States, with payment for the work by the United States, as agreed with the United States.

The record states that the United States paid Mr. Gaylord $775,000 for his work, including the design of smaller and then full size models for the nineteen soldiers and supervision of the steel casting, and that Cooper-Lecky was paid over five million dollars, including casting, construction, and other costs. All work was done as agreed by the United States, and the initial contract underwent nineteen modifications.

Despite the copyright provisions in the contract, Cooper-Lecky and Mr. Gaylord registered various copyrights as the work progressed, and the record reports assorted debates concerning the right to profit from peripheral commercial activity, the record mentioning such items as coffee mugs, framed pictures, and small models of the soldiers in The Column. In May 1993 Cooper-Lecky wrote Mr. Gaylord that "the American Battle Monuments Commission had withdrawn their claim for copyright ownership and/or royalties received from same," and Cooper-Lecky and Mr. Gaylord entered an "Agreement for Copyright Licensing Program," which states that

> 1. . . . Gaylord is entitled to retain sole ownership of the copyright for the Soldier Sculptures [including] the sketches, reproductions, photographs, prints and all drawings.
> . . .
> 5. Gaylord acknowledges that Cooper-Lecky is the sole author of the collective work embodied by the overall Memorial [including] the individual soldier sculptures authored by Gaylord.

Neither the United States nor any government agency was a party to this agreement. Whatever this agreement accomplished as between its parties, it cannot constitute a

relinquishment of the government's rights under the contract or pursuant to 28 U.S.C. §1498(b).  Indeed, when the government was later asked, the Army's Contracting Officer made a strong and unequivocal demand for assignment of the "improperly registered copyrights," and sending the Decision to contractor Cooper-Lecky and subcontractor Gaylord:

> 6.  In accordance with the contract terms, Cooper-Lecky was paid for its services and work on the KWVM, and the Government was given exclusive control over the data, design, and the completed work of the KWVM. The contract clauses ensure the Government's unlimited rights to the KWVM and prevent the contractor or subcontractors from restricting the Government or the public's use of the KWVM.
>
> 7.  The Contractor having taken an action that is proscribed by the contract, an appropriate remedy is to execute assignments of the improperly registered copyrights to the Government, so that they may remain in the public domain as intended. Cooper-Lecky (or its successor) shall assign its copyrights in the KWVM to the Government, and enlist its subcontractors to do the same.
> . . . .
> 11.  The contractor, and all others who might purport to derive copyrights with respect to work performed under contract number DACA31-90-C-0057, shall immediately cease and desist any communication or suggestion to the public or to any Government agency to the effect that there is a  copyright on the KWVM or any elements thereof.

Final Decision of the Engineers Contracting Officer of the U.S. Army Engineer District, Baltimore, February 23, 2000.  This document, marked as Trial Exhibit 14, is in the record provided to this court, as are the other contracts and other material relevant to these relationships.  See Datascope Corp. v. SMEC, Inc., 879 F.2d 820, 822 n. 1 (Fed. Cir. 1989) (noting that the decision on appeal may be affirmed on alternative grounds that are supported by the record).  Yet my colleagues on this panel hold that the entirety of these events must be ignored.

The panel majority suggests that it is improper for the court to consider the

government's rights, stating that they were not briefed on this appeal. These aspects were before the Court of Federal Claims, and the record is replete with all of the contracts, as well as the Contracting Officer's decision on copyright ownership. See Kamen v. Kemper Fin. Services, Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

Section 1498(b) of Title 28 is the statute under which this suit was brought, and its provisions control Mr. Gaylord's right of enforcement of these copyrights. Mr. Gaylord invoked §1498(b) in his complaint, and the copyrights he now seeks to enforce against the United States are for the work he performed for the United States. The panel majority holds that these copyrights are indeed enforceable against the United States, despite the contractual and statutory obligations under which he was hired, worked, and was paid by the United States. However, the court's disregard of the public's ownership of its War Memorial, and casual negation of contractual and statutory provisions relating to copyright, is simply untenable. Cf. Dorris v. Absher, 179 F.3d 420, 426 (6th Cir. 1999) (concluding that a court may raise aspects sua sponte "when the failure to do so would constitute a miscarriage of justice.").

The provisions of the contract with the United States, and the statutory constraints of §1498(b) are unambiguous as to the copyright issues concerning the Korean War Veterans Memorial. Whatever artistic or commercial rights remain with or could be allocated to Mr. Gaylord, the contractual and statutory rights of the United States control. With respect to the issue presented, the United States has an unencumbered right to use a picture of the

Korean War Veterans Memorial for governmental purposes.

It is not disputed that use of a photograph of the Memorial on a postage stamp is use by the United States; indeed, that is the basis for the panel majority's ruling of copyright infringement by the United States. My colleagues are incorrect in ruling that Mr. Gaylord can enforce, against the United States, copyrights on the work he did for the United States. This is an important question, of significant public concern, and should not be decided by default. See, e.g., United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 445-46 (1993) ("[A] court may consider an issue 'antecedent to ... and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief."); Arcadia v. Ohio Power Co., 498 U.S. 73, 77 (1990)(same).

II

The Court of Federal Claims decided the case on the ground of fair use, holding that the depiction of the Korean War Veterans Memorial on the postage stamp is a "transformative" work. The court explained that the image on the stamp has a "new and different character" from the sculpture at the Memorial, depicting a "surrealistic environment with snow and subdued lighting where the viewer is left unsure whether he is viewing a photograph of statutes or actual human beings." Gaylord v. United States, 85 Fed. Cl. 59, 68-69 (2008). Mr. Alli's photograph was further edited by the Postal Service, to amplify the stark effect of the snowy image.

Clear error has not been shown in the Court of Federal Claims' factual findings supporting the statutory factors of fair use. A transformative work is generally deemed a fair use of a copyrighted work. See Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605 (2d Cir. 2006); Blanch v. Koons, 467 F.3d 244 (2d Cir. 2006); Kelly v. Arriba Soft

Corp., 336 F.3d 811, 818-20 (9th Cir. 2003). This finding of fair use of itself establishes the right of the United States to use a picture of the Memorial on a United States postage stamp, without liability for copyright infringement.

The Contracting Officer observed that the contractors' assertion of copyright "unreasonably and unfairly impact[s] the end users of the Memorial," and "produce[s] a chilling effect on the public's ability to use the [Memorial] as intended." Final Decision of the Engineers Contracting Officer of the U.S. Army Engineer District, Baltimore, February 23, 2000 at 7. The use for governmental purposes of a photograph of the Korean War Veterans Memorial, a public monument that was designed and built with public money, is unambiguously covered by the contract and statutes under which this Memorial was built. The court errs in its holding that Mr. Gaylord is entitled to damages for copyright infringement.